T.C. Memo. 2007-145


UNITED STATES TAX COURT


JAMES G. LEBLOCH AND CATHY MICHELSEN LEBLOCH, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2724-05.                    Filed June 11, 2007.


<u>James G. LeBloch</u>, for petitioners.

<u>Michael W. Berwind</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  Petitioners petitioned the Court to redetermine respondent's determinations with respect to their 1997, 1998, and 1999 Federal income taxes.  Respondent determined

the following deficiencies and section 6662(a) accuracy-related

penalties for those years:[1]

| Year | Deficiency | Accuracy-Related Penalty |
|------|-----------|--------------------------|
| 1997 | $36,478 | $7,288.00 |
| 1998 | 18,103 | 3,620.60 |
| 1999 | 29,666 | 5,933.20 |

The deficiencies and accuracy-related penalties are primarily

attributable to respondent's determination of unreported income

(by way of bank deposits analyses) and to respondent's

disallowance of self-employment expenses (for lack of

substantiation).  Following concessions,[2] we decide the following

issues as to each subject year:

---

[1] Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code.  Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Petitioners' petition contains no allegation of error as to the accuracy-related penalties included in the notices of deficiency.  Nor does petitioners' posttrial opening brief set forth any argument as to the accuracy-related penalties (or list that matter as an issue requiring decision).  We consider petitioners to have conceded their liability for the accuracy-related penalties.  See Rule 34(b)(4); Funk v. Commissioner, 123 T.C. 213, 215 (2004); see also Palahnuk v. Commissioner, 127 T.C. 118, 120 n.2 (2006); Harbor Cove Marina Partners Pship. v. Commissioner, 123 T.C. 64, 66 (2004); cf. Swain v. Commissioner, 118 T.C. 358 (2002) (the Commissioner's burden of production under sec. 7491(c) does not apply where the taxpayer concedes liability for an accuracy-related penalty by failing to assign error to the Commissioner's determination of the accuracy-related penalty).  We also consider petitioners to have conceded all other determinations set forth in the notices of deficiency that petitioners did not adequately pursue in their posttrial opening brief.  See Palahnuk v. Commissioner, supra at 120 n.2; Harbor Cove Marina Partners Pship. v. Commissioner, supra at 66.

1. Whether petitioners underreported their income. We hold they did in the amounts set forth herein.

2. Whether petitioners may deduct the disputed expenses. We hold they may not.

FINDINGS OF FACT

A. Preface

Some facts were stipulated or contained in the exhibits submitted therewith. We find the facts accordingly. Petitioners were husband and wife from December 31, 1997, through the end of the subject years, and they filed joint Federal income tax returns for those years. When their petition was filed, they resided in a 3-bedroom house (residence) in Laguna Beach, California. Petitioners purchased the residence for $563,000, each of them paying half of the downpayment, and the interior of the residence measured approximately 2,200 square feet. That square footage does not include a 2-car garage that measured approximately 400 square feet.[3] At the time of trial, petitioners were divorced, and petitioner Cathy Michelsen LeBloch (Michelsen) lived in or around Brisbane, Australia.

With respect to their household bills and other finances, petitioners had an arrangement that they pay equally all common expenses (e.g., mortgage, property taxes, utilities) and that the

_____

[3] The record does not establish whether the garage was attached to the residence.

spouse benefiting from any other expense pay that expense. Petitioners maintained separate financial accounts and did not own any financial account jointly. When one of them paid a common expense in full, or paid an expense of the other, the other one typically wrote contemporaneously a check to the payee for half of the expense (in the case of a common expense) or for the full expense.

## B. LeBloch

James G. LeBloch (LeBloch) received a law degree from the University of Illinois in 1972 and a graduate law degree in taxation from New York University in 1978. He worked for General Motors Corp. from about 1972 through 1980, except for approximately 9 months when he was earning his graduate law degree. He worked as tax counsel for Monsanto Corp. from about 1980 through 1988 and as a chief financial officer for Seagate Technology from 1988 through 1990. He worked from 1990 through 1999 as a senior attorney in respondent's Office of Chief Counsel in Los Angeles, California. He has worked in private practice as a tax attorney since 2000.

## C. Nature's Touch

Michelsen formed and operated three retail gift shops known as Nature's Touch. From January 1 through November 23, 1997, she operated two of the shops as a sole proprietor; she operated the third shop as a sole proprietor from its opening on November 1,

1997, through November 23, 1997.  After November 23, 1997, she operated the three shops as an officer and director of her wholly owned corporation, NT, Inc. (NT).  Michelsen formed NT in November 1997, and she has always been its sole officer, sole director, and sole shareholder.

Michelsen opened one of the three Nature's Touch shops in San Juan Capistrano, California, in June 1993.  Nineteen months later, she opened the second shop in Palm Desert, California.  The Palm Desert shop did not do well financially, and Michelsen moved the business of that shop to Palm Springs, California, in May 1997.  Michelsen's lease of the vacated premises had not yet expired at the time of the move, and she sublet those premises in exchange for $3,000.  On November 1, 1997, Michelsen opened the third Nature's Touch shop in Carlsbad, California.  The approximate sizes of the shops in San Juan Capistrano, Palm Springs, and Carlsbad were 1,300, 1,700, and 1,500 square feet, respectively.

The Nature's Touch shops sold mostly 300 to 500 different gift items (e.g., fountains, garden supplies, stationery, books).  Michelsen purchased those items from approximately 130 different vendors and displayed most of the items throughout the shops in wooden display cubes built by her and LeBloch, or on wall and ceiling hangers built by LeBloch.  LeBloch helped Michelsen prepare each shop for its opening, and he helped her maintain the

shops by performing a variety of handyman services.  LeBloch also advised Michelsen (initially in her capacity as a sole proprietor and later in her capacity as an officer and director of NT) on financial and legal matters related to the shops, as well as on items to purchase as inventory for the shops.  LeBloch routinely paid expenses for the shops out of his personal finances, and he contemporaneously requested and obtained from the shops reimbursement for those payments through his submission to Michelsen of written reports that listed the specific expenses that he paid on behalf of the shops, accompanied by any related receipt.  During the subject years, LeBloch did not receive any compensation for services that he performed for or on behalf of the shops.

Each Nature's Touch shop had a manager and three or four other year round employees.[4]  The general duties of the managers, with respect to the shops they managed, was to monitor the shop's inventory and report to Michelsen the need or desire for any additional inventory; to oversee and schedule employees; to keep the shop clean and orderly; and to prepare the shop's receipts for weekly deposit in the bank.  Michelsen's main role in the shops was to oversee the work of the managers by speaking to them telephonically, usually once a day while they were at the shops

_____

[4] The number of employees at each shop increased approximately threefold during the seasonal 2-month period beginning on November 1.

and she was at the residence, about the status of the shops including whether any manager needed or desired any specific piece (or pieces) of inventory that Michelsen had at the residence. Michelsen purchased inventory for all of the shops, usually by calling the vendors and having most (if not all) of the merchandise shipped directly to the shops.[5] She aimed to coordinate a somewhat even distribution of inventory between the shops, and, when she visited the shops (usually on a weekly basis), she transported inventory (in her car) from the residence to the shops or from one shop to another. Michelsen also prepared and monitored the budget for the shops, and she generally deposited the shops' weekly receipts into the bank. For the most part in 1997, Michelsen also toured a few locations in Southern California in search of a place to move the second Nature's Touch store and a place to open the third Nature's Touch shops.

Inventory was displayed at the shops or, to a lesser extent, stored at the residence in either the garage or in the guest bedroom closet (approximately 56 square feet in size), or at the

---

[5] Michelsen also once or twice a year purchased inventory at retailer-only gift shows. There, petitioners (and sometimes one or more employees of Nature's Touch) viewed various merchandise displayed by manufacturers (usually on tables) and ordered products for sale at the Nature's Touch stores.

shops.[6]  (The record does not establish the specific pieces or amount of inventory that was stored at any of these places.) Petitioners did not park automobiles in the garage, but they used the garage to store items of inventory and for personal purposes such as storing shovels, rakes, and tools unrelated to the shops. Michelsen used another bedroom (approximately 225 square feet in size) in the residence as an office where she performed some of her work related to the shops.  This bedroom was set up by petitioners as an office, and it was not used for any other purpose (e.g., it did not have any bedroom furniture).  The office had a computer which Michelsen used mainly for budgeting and accounting purposes related to the shops; Michelsen did not record the income and expenses of the Nature's Touch shops on paper (e.g., in a ledger) but recorded the information solely on a program on the computer.  The office also had a facsimile machine and a telephone with two lines, the second line generally devoted to the facsimile machine.

During 1997, the Nature's Touch shops experienced dire cashflow problems that required an immediate borrowing of cash. On four occasions during that year, Michelsen informed LeBloch that she needed cash to alleviate a cashflow problem of the shops, and she asked LeBloch to lend her the necessary cash.  On

---

[6] Michelsen also kept in the guest bedroom closet "old tapes" and "old credit card records".

May 29, 1997, as a result of Michelsen's moving the shop to Palm Springs, LeBloch lent Michelsen $5,000 to use in the business. On each of the days October 6 and 17 and November 24, 1997, as a result of Michelsen's opening of the shop in Carlsbad, LeBloch lent Michelsen another $10,000. Each loan in 1997 was informal; the parties thereto (at the time living together as significant others) understood that Michelsen would repay the loans without interest in the near future when the shops' cashflow allowed her to do so. Michelsen used all $35,000 of the loan proceeds ($5,000 + $10,000 + $10,000 + $10,000) for the benefit of the Nature's Touch shops. On December 30, 1997, Michelsen repaid the entire $35,000.

The Nature's Touch shops experienced additional cashflow problems in 1998 that required the borrowing of money. On five occasions during that year, Michelsen informed LeBloch that NT needed cash to alleviate a cashflow problem of the shops, and she asked LeBloch to lend NT the necessary cash. In or around December 1997, Michelsen (on behalf of NT) had purchased a lot of inventory for the holiday season, and Michelsen realized in January 1998, when the bills were coming due on these purchases, that she would need additional money for the business. Michelsen (on behalf of NT) was also entering into a permanent lease for the shop in Carlsbad, and she needed money to pay the first and last months' rent for those premises as well as an accompanying

security deposit. She also needed money to buy inventory for the newly opened shop in Carlsbad, as well as to pay for display units and fixtures such as counters, shelving, and special lighting. On the respective days January 6 and 9, 1998, LeBloch lent Michelsen $20,000 and $10,000 for use in the business of NT. On each of the days January 14 and February 2 and 6, 1998, LeBloch lent $10,000 directly to NT. Each of these five loans was informal, the principals thereto (husband and wife) understanding that Michelsen (with respect to the first two loans) and NT (with respect to the last three loans) would repay the loans without interest in the near future when the shops' cashflow allowed her or it to do so. Of the $60,000 in loans made in 1998 ($20,000 + $10,000 + $10,000 + $10,000 + $10,000), $15,000 was repaid to LeBloch in 1998 ($10,000 on April 8, 1998, and $5,000 on May 8, 1998) and $20,000 was repaid to LeBloch in 1999 ($10,000 on January 19, 1999, and $10,000 on May 8, 1999). Michelsen (or NT) used all of the $60,000 in loan proceeds in the business of the Nature's Touch shops, and as of the time of trial, all of the $60,000 had been repaid.

During 1999, petitioners traveled to Australia and Tahiti. Petitioners flew from Los Angeles, California, to Sydney, Australia, on September 16, 1999. They stayed in Sydney for 3 nights and then rented a car and drove to Brisbane. On October 1, 1999, they flew from Brisbane to Papeete, Tahiti. They stayed

in Papeete for 8 nights and returned to Los Angeles on October 8, 1999.  During those travels, Michelsen attended a gift trade fair in Sydney where she found a single product that she ended up selling at the Nature's Touch shops.  She also in or around Brisbane purchased some other items which she displayed for sale in the Nature's Touch shops.  Petitioners incurred $12,847.26 of expenses for the trip to Australia and considered $4,129 of that amount to be a business-related travel expense (as discussed further below).  Petitioners did not consider or report any of their expenses related to Tahiti as business related.

D.  1997, 1998, and 1999 Schedules C

    1.  1997

For 1997 Federal income tax purposes, Michelsen reported the income and expenses of the Nature's Touch shops on a 1997 Schedule C, Profit or Loss From Business, filed as part of their return.  The schedule reported on the basis of an accrual method of accounting that the shops, for 1997, had gross receipts of $501,574, costs of goods sold of $289,647, and total expenses of $239,745, resulting in a net loss of $27,818.[7]  The schedule was accompanied by a 1997 Form 8829, Expenses For Business Use of Your Home, reporting home operating expenses of $2,367 and home

---

[7] According to the 1997 Schedule C, the inventory of the shops was $98,107 at the beginning of the year and $289,647 at the end of the year.

depreciation of $2,388.  The Form 8829 itemized the home

operating expenses as follows:

```
        Direct expenses:
          Repairs and maintenance                    $11
          Utilities                                  989
        Indirect expenses:
          Insurance                      683
          Repairs and maintenance      1,999
          Utilities                    2,743
            Total                       5,425
        Business-use percentage         .252        1,367
            Total                                    2,367
```

Petitioners did not deduct for 1997 any of either the reported

home operating expenses or the reported home depreciation but

deducted all of those amounts for 1998 as a carryover to that

year.  Petitioners claimed on the 1997 Form 8829 that 25.2

percent of the residence was used exclusively for business

purposes; they stated on the form that they ascertained that

percentage by dividing the "Area used regularly and exclusively

for business * * * or for storage of inventory" (reported as 630

square feet) by the "Total area of home" (reported as 2,500

square feet).[8]  The 1997 Schedule C itemized the total expenses

of $239,745 as follows:

```
            Advertising                         $2,339
            Car and truck                        4,161
            Depreciation                         1,675
            Insurance (other than health)        5,843
            Legal and professional services        475
            Rent or lease:
              Other business property           76,898
```

_____

[8] The record does not reveal how petitioners ascertained
either square footage.

| | |
|---|---|
| Supplies | 17,560 |
| Travel | 12,365 |
| Meals and entertainment (after 50-percent reduction) | 1,588 |
| Utilities | 10,921 |
| Wages | 87,201 |
| Other expenses[1] | 18,719 |
| Total | 239,745 |

[1] The 1997 Schedule C did not identify any of these "other expenses".

2. <u>1998</u>

For 1998 Federal income tax purposes, petitioners did not report the income and expenses of the Nature's Touch shops on their personal income tax return. Their 1998 personal return included a 1998 Schedule C that reported the income and expenses of Michelsen as "Board Chairman of NT". The schedule reported on the basis of the cash receipts and disbursements method of accounting that the reported business had a net profit of $23,193 for 1998, resulting from gross receipts of $36,808, total expenses of $4,137, and home business expenses of $9,478. The schedule was accompanied by a 1998 Form 8829 reporting that 25.2 percent of the residence (630/2500) was used exclusively for business purposes and that the $9,478 of home business expenses consisted of operating expenses of $4,702 (inclusive of the $2,367 carryover from 1997) and depreciation of $4,776 (inclusive of the $2,388 carryover from 1997). The Form 8829 itemized the home business expenses as follows:

```
     Operating expenses:
       Direct expenses:
         Utilities                              $951
       Indirect expenses:
         Insurance                     844
         Repairs and maintenance     1,802
         Utilities                   2,846
           Total                     5,492
         Business-use percentage      .252    1,382
         Carryover from 1997                  2,367
           Total                             ¹4,702
       Depreciation:
         Current depreciation                 2,388
         Depreciation carryover
           from 1997                          2,388
           Total                              4,776
       Total                                  9,478
```

¹ We note petitioners' $2 adding mistake.

The 1998 Schedule C itemized the total expenses of $4,137 as

follows:

```
     Supplies                                 $835
     Meals and entertainment
       (after 50-percent reduction)          3,302
       Total                                  4,137
```

3.  1999

For 1999 Federal income tax purposes, petitioners did not

report the income and expenses of the Nature's Touch shops on

their personal income tax return.  Their 1999 personal return

included a 1999 Schedule C that reported the income and expenses

of Michelsen as "Corporate Director/Consultant".[9]  The schedule

reported on the basis of an accrual method of accounting that the

[9] Although the 1999 Schedule C lists the "Name of
proprietor" as "James and Cathy LeBloch", the return clarifies on
Schedule SE, Self-Employment Tax, that the income reported on the
Schedule C is that of Michelsen only.

reported business had a net profit of $14,029 for 1999, resulting from gross receipts of $37,677, total expenses of $18,206, and home business expenses of $5,442. The schedule was accompanied by a 1999 Form 8829 reporting that 25.2 percent of the residence (630/2500) was used exclusively for business purposes and that the $5,442 of home business expenses consisted of operating expenses of $3,054 and depreciation of $2,388. The Form 8829 itemized the home business expenses as follows:

```
Operating expenses:
  Direct expenses:
    Utilities                                $1,359
    Other expenses                              264
  Indirect expenses:
    Insurance                        692
    Repairs and maintenance        2,132
    Utilities                      2,840
      Total                        5,664
    Business-use percentage         .252    1,427
      Total                                 ¹3,054
  Current depreciation                       2,388
  Total                                      5,442
```

[1] We note petitioners' $4 adding mistake.

The 1999 Schedule C itemized the total expenses of $18,206 as follows:

```
Depreciation                                $1,175
Legal and professional services                556
Office expense                                 246
Rent or lease:
  Vehicles, machinery, and equipment         7,476
Travel                                        4,129
Meals and entertainment
  (after 50-percent reduction)               1,374
Other expenses[1]                             3,250
  Total                                      18,206
```

[1] The 1999 Schedule C did not identify any of these "other expenses".

E.  Amended Returns

On their 1998 Federal income tax return, petitioners reported adjusted gross income of $73,361.  The $73,361 consisted of the following reported items and amounts:

| | |
|---|---:|
| LeBloch's wages from IRS | $71,091 |
| Interest | 1,004 |
| Schedule C net profit | 23,193 |
| IRA deduction | (2,000) |
| One-half of self-employment tax | (1,639) |
| Alimony paid | (18,288) |
|   Adjusted gross income | 73,361 |

On their 1999 Federal income tax return, petitioners reported adjusted gross income of $104,971.  The $104,971 consisted of the following reported items and amounts:

| | |
|---|---:|
| LeBloch's wages from IRS | $72,130 |
| Michelsen's wages from NT | 31,000 |
| Interest and ordinary dividends | 84 |
| Taxable refunds | 90 |
| Schedule C net profit | 14,029 |
| Capital gain | 53 |
| One-half of self-employment tax | (991) |
| Alimony paid | (11,424) |
|   Adjusted gross income | 104,971 |

On or about April 14, 2002, after the Commissioner had begun his audit of the subject years and had proposed his adjustments increasing petitioners' taxable income to reflect the unreported income ascertained under the bank account analyses, petitioners filed an amended 1998 Federal income tax return claiming without further explanation that $21,554 reported as compensation received from NT during 1998 was really a loan repayment.  At the

same time, petitioners also filed an amended 1999 Federal income tax return claiming without further explanation that $13,038 reported as compensation received from NT during 1999 was really a loan repayment.  Each of these amended returns claimed a refund resulting from the claimed recharacterization of the originally reported compensation as loan repayments.  Respondent did not grant either of those claims for refund.

F.  Petitioners' Financial Accounts

    1.  Overview

    Throughout the subject years, petitioners had 13 bank or investment accounts (collectively, financial accounts).  Nine of the financial accounts were in the name of LeBloch.  The remaining four financial accounts were in the name of Michelsen.

    2.  LeBloch's Accounts

    LeBloch had three financial accounts at the LAIRE Federal Credit Union (LAIRE).  The first account, a primary savings account (LAIRE 00), was open from January 1, 1997, through February 12, 1999.  The second account, a checking account (LAIRE 50), was open during all of 1997 and 1998.  The third account, a secondary savings account (LAIRE 01), was open from June 19 through December 31, 1998.

    LeBloch had three financial accounts at the Postal & Federal Employees Credit Union (PFE).  Each of these accounts was open from September 24, 1998, through December 31, 1999.  These

accounts were a primary share account (PFE S1), a subshare account (PFE S2), and a reality checking account (PFE S18).

LeBloch's last three financial accounts were brokerage accounts. One brokerage account was a Merrill Lynch investment account (Merrill Lynch account), which was open throughout the subject years. Another brokerage account was a Paine Webber investment account (Paine Webber account), which was open during all of 1997. The last brokerage account was a second account at Paine Webber; this account was open during all of 1999.

### 3. Michelsen's Accounts

Michelsen's four accounts were all at Bank of America (BA). The first account, a business checking account (BA 1225), was open from January 1 through April 18, 1997. The second account, another business checking account (BA 9606), was open from April 18 through December 31, 1997. These two accounts were the checking accounts for the Nature's Touch shops when operated through Michelsen's sole proprietorship; afterwards, BA 9606 was the corporate bank account for NT. The balance in BA 1225 was transferred to BA 9606 on April 18, 1997.

Michelsen's third account, a checking account (BA 7417), was open from January 1 through April 22, 1997. Her fourth account, another checking account (BA 9605), was open from April 22, 1997, through December 31, 1999. The balance in BA 7417 was transferred to BA 9605 on April 22, 1997.

G.  Notices of Deficiency

   1.  Overview

    On November 9, 2004, respondent issued to petitioners a notice of deficiency for 1997 and a notice of deficiency for 1998 and 1999.  The notices of deficiency determined the following adjustments to amounts reported on petitioners' Federal income tax returns for 1997, 1998, and 1999:

|  | 1997 | 1998 | 1999 |
|---|---|---|---|
| Unreported rental income | $3,000 | -0- | -0- |
| Unreported interest income | 2,331 | -0- | $115 |
| Unreported capital gains income | -0- | $155 | -0- |
| Unreported Schedule C income | 63,852 | 36,368 | 49,368 |
| Total unreported income | 69,183 | 36,523 | 49,483 |
| Self-employment tax deduction | (4,614) | (3,531) | (4,676) |
| Disallowed itemized deductions | 1,795 | -0- | 1,424 |
| Disallowed alimony expense | 2,436 | 1,488 | 624 |
| Disallowed Schedule C expenses | 29,276 | 13,615 | 23,648 |
| Total increases to income | 98,076 | 48,095 | 70,503 |

The notices of deficiency itemized the disallowed Schedule C expenses as follows:

| | 1997 | 1998 | 1999 |
|---|---|---|---|
| Insurance | $1,392 | -0- | -0- |
| Meals and entertainment | 1,588 | $3,302 | $1,374 |
| Supplies | 1,508 | 835 | -0- |
| Travel | 9,737 | -0- | 4,129 |
| Business use of home | -0- | 9,478 | 5,442 |
| Rent or lease expense | -0- | -0- | 7,476 |
| Office expense | -0- | -0- | 246 |
| Legal and professional | -0- | -0- | 556 |
| Depreciation | -0- | -0- | 1,175 |
| Other expenses | 15,051 | -0- | 3,250 |
| Total | 29,276 | 13,615 | 23,648 |

   2.  Respondent's Bank Deposits Analyses

    Respondent determined the amounts of unreported income listed in the notices of deficiency by performing bank deposits

analyses.  The total deposits (including interest credited to accounts) into petitioners' financial accounts were as follows:

|  | 1997 | 1998 | 1999 |
|---|---|---|---|
| LAIRE 00 | $130,271 | $15,906 | $254 |
| LAIRE 50 | 163,012 | 134,724 | -0- |
| LAIRE 01 | -0- | 5,130 | -0- |
| PFE S1 | -0- | 15,038 | 12,086 |
| PFE S2 | -0- | 5,150 | 10,048 |
| PFE S18 | -0- | 34,738 | 95,043 |
| Paine Webber account | 31,111 | -0- | -0- |
| Merrill Lynch account | 77,045 | -0- | 10,000 |
| BA 9605 | 65,970 | 59,680 | 64,145 |
| BA 7417 | 25,977 | -0- | -0- |
| BA 1225 | 226,146 | -0- | -0- |
| BA 9606 | 367,522 | -0- | -0- |
| Total | 1,087,054 | 270,366 | 191,576 |

As to those deposits, respondent's bank deposits analyses characterized the following amounts as nontaxable:

|  | 1997 | 1998 | 1999 |
|---|---|---|---|
| Interaccount transfers | $293,008 | $129,112 | $40,702 |
| Loan receipts | 22,600 | -0- | -0- |
| VISA advances | 21,750 | 4,500 | 3,200 |
| Sales tax remittances (Jan. to Sept. 1997) | 32,255 | -0- | -0- |
| Returned deposits | 1,387 | -0- | -0- |
| Wedding gift | -0- | 5,000 | -0- |
| Total | 371,000 | 138,612 | 43,902 |

Respondent's bank deposits analyses determined that the following deposits were reported on the subject Federal income tax returns:

|  | 1997 | 1998 | 1999 |
|---|---|---|---|
| Wages (less withholdings) | $56,643 | $54,305 | $79,309 |
| Interest | 3,866 | 1,004 | 49 |
| Dividends | -0- | -0- | 35 |
| Schedule C gross receipts | 501,574 | 36,808 | 37,677 |
| Schedule D sales | 86,487 | -0- | -0- |
| Total | 648,570 | 92,117 | 117,070 |

Respondent's bank deposits analyses concluded that petitioners had unexplained bank deposits as follows:

|  | 1997 | 1998 | 1999 |
|---|---|---|---|
| Total deposits | $1,087,054 | $270,366 | $191,576 |
| Nontaxable items | (371,000) | (138,612) | (43,902) |
| Reported amounts | (648,570) | (92,117) | (117,070) |
| Unexplained deposits[1] | 67,484 | 39,637 | 30,604 |

[1] The parties do not explain the difference between the amounts of unexplained deposits and the amounts of the total unreported income set forth in the notices of deficiency.

OPINION

A. Burden of Proof

Section 7491(a) was added to the Internal Revenue Code by the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727, effective for court proceedings arising from examinations commencing after July 22, 1998. While the burden of proof in this Court is usually on a petitioning taxpayer, see Rule 142(a)(1), section 7491(a)(1) provides that the burden of proof on certain issues affecting the liability of a taxpayer for tax shifts to the Commissioner in specified circumstances. We hold that section 7491(a) does not apply to either issue before us because, we find, petitioners have not proven that they complied with the requirements of section 7491(a)(2)(B) to cooperate fully with respondent's reasonable requests for witnesses, information, documents, meetings, and interviews. See also Weaver v.

Commissioner, 121 T.C. 273, 275 (2003). In fact, we find from the record that petitioners did not cooperate with such reasonable requests by respondent during the course of the audit. We hold that petitioners bear the burden of proof.

B. Unreported Income

Gross income includes all income from whatever source derived, sec. 61(a), and taxpayers are required to keep books and records sufficient to establish their Federal income tax liability, see sec. 6001; see also sec. 1.6001-1(b), Income Tax Regs. Where taxpayers have not maintained adequate business records to establish such liability, the Commissioner may reconstruct income by any method that the Commissioner believes reflects income clearly. See sec. 446(b); Parks v. Commissioner, 94 T.C. 654, 658 (1990). The Commissioner's method need not be exact; however, it must be reasonable. See Holland v. United States, 348 U.S. 121 (1954).

The bank deposits method for computing unreported income has long been sanctioned by the judiciary. See Factor v. Commissioner, 281 F.2d 100, 116 (9th Cir. 1960), affg. T.C. Memo. 1958-94; DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992). Bank deposits are prima facie evidence of income. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Where an individual taxpayer has failed to maintain adequate records as to the amount and source of his or her income

and the Commissioner has determined that the deposits are income, the burden is on the taxpayer to show that the Commissioner's determination is incorrect.

Petitioners argue that respondent's use of the bank deposits analyses was unjustified because, they state, they kept adequate records establishing their income. We disagree. While petitioners may have used a computer program to memorialize their income and expenses, we are unable to find from credible evidence in the record that petitioners ever gave to respondent, before issuance of the notices of deficiency, adequate records to support their reported income for any subject year. On the basis of the record at hand, we hold that respondent's use of the bank deposits analyses was proper.

Petitioners argue alternatively that respondent misapplied the bank deposits analyses in that, they argue, respondent failed to recognize that most of the disputed deposits arose from nontaxable sources. Petitioners argue that respondent's bank deposits analyses should be adjusted as follows:

1997

|  | As Determined | Petitioners' Additional Adjustments | As Adjusted |
|---|---|---|---|
| Total deposits (including interest) | $1,087,054 | -0- | $1,087,054.00 |
| Less adjustments: |  |  |  |
| Interaccount transfers | 293,008 | $15,599.29 | 308,607.29 |
| Loan receipts | 22,600 | -0- | 22,600.00 |
| Loan repayments | -0- | 35,000.00 | 35,000.00 |
| VISA advances | 21,750 | 2,500.00 | 24,250.00 |
| Sales tax remittances | 32,255 | 3,800.00 | 36,055.00 |
| Returned deposits | 1,387 | -0- | 1,387.00 |
| Expense report reimbursement | -0- | 6,414.04 | 6,414.04 |
| Total | 371,000 | 63,313.33 | 434,313.33 |

Less reported income:

|  |  |  |  |
|---|---|---|---|
| Wages | 56,643 | 5,290.20 | 61,933.20 |
| Interest | 3,866 | 1,808.00 | 5,674.00 |
| Schedule C gross receipts | 501,574 | -0- | 501,574.00 |
| Schedule D sales | 86,487 | -0- | 86,487.00 |
| Total | 648,570 | 7,098.20 | 655,668.20 |
| Unexplained deposits | 67,484 | (70,111.53) | |

(2,927.53)

## 1998

|  | As Determined | Petitioners' Additional Adjustments | As Adjusted |
|---|---|---|---|
| Total deposits (including interest) | $270,366 | -0- | $270,366.00 |
| Less adjustments: | | | |
| Interaccount transfers | 129,112 | $7,578.00 | 136,690.00 |
| Loan repayments | -0- | 15,000.00 | 15,000.00 |
| VISA advances | 4,500 | -0- | 4,500.00 |
| Gifts | 5,000 | -0- | 5,000.00 |
| Total | 138,612 | 22,578.00 | 161,190.00 |
| Less reported income: | | | |
| Wages | 54,305 | 8,424.15 | 62,729.15 |
| Interest | 1,004 | -0- | 1,004.00 |
| Schedule C gross receipts | 36,808 | -0- | 36,808.00 |
| Total | 92,117 | 8,424.15 | 100,541.15 |
| Unexplained deposits | 39,637 | (31,002.15) | 8,634.85 |

## 1999

|  | As Determined | Petitioners' Additional Adjustments | As Adjusted |
|---|---|---|---|
| Total deposits (including interest) | $191,576 | -0- | $191,576.00 |
| Less adjustments: | | | |
| Interaccount transfers | 40,702 | $4,002.50 | 44,704.50 |
| Loan repayments | -0- | 20,000.00 | 20,000.00 |
| VISA advances | 3,200 | -0- | 3,200.00 |
| Total | 43,902 | 24,002.50 | 67,904.50 |
| Less reported income: | | | |
| Wages | 79,309 | 8,576.32 | 87,885.32 |
| Interest | 49 | -0- | 49.00 |
| Dividend | 35 | -0- | 35.00 |
| Schedule C gross receipts | 37,677 | -0- | 37,677.00 |
| Total | 117,070 | 8,576.32 | 125,646.32 |
| Unexplained deposits | 30,604 | (32,578.82) | |

(1,974.82)

We agree with petitioners to a large extent. We discuss their requested additional adjustments seriatim.

## 1. Interaccount Transfers

Petitioners argue that respondent's bank deposits analyses for the respective years must be adjusted to reflect $15,599.29, $7,578, and $4,002.50 of nontaxable transfers of funds between

their accounts.  Following respondent's concession in brief that the record at hand supports adjusting the amounts shown in the bank deposits analyses to reflect additional nontaxable transfers of funds between accounts, the disputed items in this category are as follows:

### 1997

| | |
|---|---|
| December 18, 1997, deposit of previously withdrawn funds | $1,900.00 |
| May 23, 1997, check drawn on LAIRE 50 and payable to Michelsen | 400.00 |
| July 3, 1997, check drawn on LAIRE 50 and payable to Michelsen | 393.00 |
| September 17, 1997, check drawn on LAIRE 50 and payable to Michelsen | 240.00 |
| November 20, 1997, check drawn on Paine Webber account and payable to Michelsen | 430.00 |
| Business deposit mistakenly deposited into Michelsen's personal account; contemporaneously transferred to business account | $5,978.83 |
| | 9,341.83 |

### 1998

| | |
|---|---|
| Check from LeBloch account at LAIRE to Michelsen for her payment of his personal expenses | $745.00 |

### 1999

| | |
|---|---|
| Check from NT to Michelsen in reimbursement of her payment of an expense of NT | $660.50 |

We agree with petitioner that all of these disputed items are nontaxable to them and should be reflected as such. The largest amount, $5,978.83, reflects a business deposit that was mistakenly deposited into Michelsen's personal account and then contemporaneously transferred to the business account when Michelsen discovered the mistake. The next largest amount, $1,900, reflects funds that were withdrawn by LeBloch and then redeposited into his account. The $660.50 deposit reflects a reimbursement that NT made to Michelsen. The remaining five amounts are simply transfers of cash from LeBloch to Michelsen.

2. Loan Repayments

Petitioners argue that respondent's bank deposits analyses for the respective years must be adjusted further to reflect $35,000, $15,000, and $20,000 of nontaxable loan repayments deposited into one of LeBloch's financial accounts. We agree. Case law establishes a two-part test for determining whether a transfer of money qualifies as debt. First, repayment of the transferred funds cannot be contingent upon a future event. Second, the transfer must be made with a reasonable expectation, belief, and intent that it be repaid. See Zimmerman v. United States, 318 F.2d 611 (9th Cir. 1963); Estate of Trompeter v. Commissioner, T.C. Memo. 1998-35. Whether a transfer is made with the requisite expectation, belief, and intent is factual. See John Kelley Co. v. Commissioner, 326 U.S. 521 (1946).

Our agreement with petitioners that LeBloch's transfers of money to Michelsen and NT were loans flows from our findings of fact that petitioners regularly advanced funds to each other without formal documentation and without formal terms, that the transfers in question were made with the expectation, belief, and intent that they be repaid, that the transfers in question were made incident to the transferee's need for operating funds, and that the transfers in question were repaid by the transferee shortly after receipt.[10] LeBloch lent $95,000 for use (and that was used) in the business of the Nature's Touch shops, and, of that amount, $35,000 was repaid in 1997, $15,000 was repaid in 1998, $20,000 was repaid in 1999, and $25,000 was repaid after 1999. In addition, petitioners had an informal understanding that either of them would advance funds to the other without formal terms and that the one for whose benefit the funds were advanced would repay them. In fact, as to LeBloch, it was not uncommon for him regularly to pay a common expense in full and then contemporaneously receive reimbursement from Michelsen for her share of that expense. Nor was it uncommon for LeBloch regularly to pay out of his personal funds expenses of a Nature's Touch shop and then seek and obtain reimbursement from the shops

---

[10] Because respondent makes no assertion that LeBloch's transfers were contributions of equity rather than loans, we do not consider that question. See Metrocorp, Inc. v. Commissioner, 116 T.C. 211, 217 (2001).

for that payment.  We also note that petitioners never intermingled their funds in a joint account, but kept their financial accounts separate, and that petitioners' relationship throughout the subject years was one in which they each understood that they were responsible for the payment of their share of the expenses.  We hold for petitioners on this item.[11]

3.  VISA advances

Petitioners argue that they are entitled for 1997 to an adjustment of $2,500 for VISA advances.  Respondent concedes that this $2,500 is not taxable income to petitioners, and we so hold.

4.  Sales Tax Remittances

Petitioners argue that they are entitled for 1997 to an adjustment of $3,800 for sales tax remittances for October and November 1997.  We agree.  Michelsen operated the Nature's Touch shops as a sole proprietorship from January 1 through November 23, 1997, and she (as a conduit) collected sales tax on the sales made at the shops during that time.  She deposited the collected sales tax into the shops' business account and later remitted that tax to the State of California.  Respondent's bank deposits analysis for 1997 made an adjustment for sales tax

_____

[11] Whereas we understand petitioners to request that we also hold that other amounts reported as compensation from NT were actually loan repayments, we decline to do so.  Michelsen was the sole reported recipient of compensation from NT, and petitioners make no assertion in this proceeding that Michelsen lent money to NT.

remittances only through September 1997. On the basis of our review of the record, we find that on November 24, 1997, $3,800 in sales tax was remitted to the State of California on behalf of the Nature's Touch shops and conclude that petitioners are entitled to their requested $3,800 adjustment.

5. Expense Report

Petitioners argue that they are entitled for 1997 to an adjustment of $6,414.04 for expenses report reimbursement. In support thereof, petitioners point the Court to a December 29, 1997, check drawn on the NT account payable to LeBloch in the amount of $41,667. The check states on its face that it is "Payment for Loan", and LeBloch deposited the check into his regular savings account at LAIRE. Petitioners point out that $35,000 of the check was the loan repayment discussed herein and argue that the balance ($252.96), after taking into account the $6,414.04, was for reimbursement of LeBloch's payment of Michelsen's share of a personal utility expense. We agree with petitioners (in that we find) that the $6,414.04 was paid to LeBloch as reimbursement of expenses that he paid on behalf of NT and allow the requested adjustment.

6. Wages

Petitioners argue that they are entitled for the respective years to adjustments of $5,290.20, $8,424.15, and $8,576.32 for wages. As petitioners see it, their wages for each year should

have been calculated by using the amounts shown on the Forms W-2, Wage and Tax Statement; in other words, the amount for each year that equals their reported gross wages less the sum of the reported amounts withheld for Federal income tax, Social Security tax, and Medicare tax. We conclude differently. The bank deposits analyses correctly reflect only the portion of his wages that was deposited into his account (i.e., in addition to the reported amounts of tax withheld, LeBloch apparently had other amounts taken out of his gross wages before those wages were deposited into his account). Those amounts are different from the amounts referenced by petitioners.

C. Home Office Deduction for Each Subject Year

Petitioners are generally precluded from deducting expenses incurred in connection with the business use of the residence. See sec. 280A. Pursuant to section 280A(c)(1), however, petitioners may deduct expenses allocable to a portion of the residence if that portion was exclusively used on a regular basis (1) as a principal place of business, (2) as the place for meeting with customers, clients, or patients in the normal course of business, or (3) in the case of an unattached separate structure, in connection with the business.[12] See also

---

[12] Sec. 280A(a) also does not apply to items allocable to space withing a dwelling unit that is used on a regular basis for the storage of inventory held for use in the taxpayer's trade or business of selling products at retail provided the dwelling unit
(continued...)

Commissioner v. Soliman, 506 U.S. 168 (1993); Browning v. Commissioner, 890 F.2d 1084, 1087-1088 (9th Cir. 1989), affg. T.C. Memo. 1988-293; Cao v. Commissioner, T.C. Memo. 1994-60, affd. without published opinion 78 F.3d 594 (9th Cir. 1996).

Petitioners argue that they are entitled to a deduction for each subject year attributable to their business use of a portion of the residence. According to petitioners, the office, guest bedroom closet, and garage (collectively, premises) in or at the residence were used exclusively for business, and the premises are approximately 25 percent of the residence's square footage. We understand petitioners to argue that, during each subject year, Michelsen stored inventory on the premises and used the premises to work on opening more Nature's Touch stores. We also understand petitioners to argue that Michelsen also used the premises after the formation of NT to conduct her business as an officer of NT.

We do not believe that petitioners meet any of the three prongs underlying the just-referenced exception of section 280A(c)(1). As to 1997, when Michelsen operated the Nature's Touch stores as a sole proprietor, the stores' principal place of business was not in any part of the residence. Nor are we

_____

[12](...continued)
is the sole fixed location of that business. See sec. 280A(c)(2). That provision is inapplicable here, where the residence was not the sole fixed location of the Nature's Touch shops.

persuaded that Michelsen met there with customers, clients, or patients in the normal course of business. Nor does the record establish that any part of the residence, including the garage, was in an "unattached separate structure".

We also are not persuaded that the exception was met for either remaining year in issue. In order for a taxpayer to establish use on a "regular" basis, the business use must be more than occasional or incidental. See Jackson v. Commissioner, 76 T.C. 696, 700 (1981). In order for a taxpayer to establish that use of a portion of a dwelling is "exclusive", the portion must be used only for business purposes. See Sam Goldberger, Inc. v. Commissioner, 88 T.C. 1532, 1556-1557 (1987); Hefti v. Commissioner, T.C. Memo. 1993-128; see also Irwin v. Commissioner, T.C. Memo. 1996-490. See generally sec. 1.280A-2(g)(1), Proposed Income Tax Regs., 45 Fed. Reg. 52404 (Aug. 7, 1980). The failure of a taxpayer to establish that the use of a portion of a dwelling is both "regular" and "exclusive" is fatal to the taxpayer's claim that such use falls within the exception of section 280A(c)(1). See Sam Goldberger, Inc. v. Commissioner, supra at 1556-1557. Although the record establishes that Michelsen performed at the residence a lot of work for the Nature's Touch stores, petitioners have not offered sufficient evidence regarding the amount of time and nature of the work conducted anywhere in the premises so as to establish

regular use, nor have they established that any portion of the premises was used exclusively in a business.[13]  Accord <u>Browning v. Commissioner</u>, <u>supra</u>.  We reject petitioners' claim for home office deductions related to the residence.

D.  <u>Self-Employment Deductions Other Than Home Office Deduction</u>

Section 162(a) lets taxpayers deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  Under that section, an expenditure is deductible if it is:  (1) An expense, (2) an ordinary expense, (3) a necessary expense, (4) paid (in the case of a cash method taxpayer) or incurred (in the case of an accrual method taxpayer) during the taxable year, and (5) made to carry on a trade or business.  See <u>Commissioner v. Lincoln Sav. & Loan Association</u>, 403 U.S. 345, 352-353 (1971); <u>Lychuk v. Commissioner</u>, 116 T.C. 374, 386 (2001).  In the case of personal travel expenses, a taxpayer also must meet two additional rules.  First, the travel expenses must arise from travel that is related primarily to the taxpayer's business.  See sec. 1.162-2(b)(1), Income Tax Regs.; see also <u>Reed v. Commissioner</u>, 35 T.C. 199

---

[13] In fact, Michelsen by her own account acknowledged that the garage was not used exclusively for business purposes and contended that the only portion of the residence used exclusively for business was the room with the office.  While petitioners ask the Court to find as to the office that Michelsen spent much time there working on expanding the Nature's Touch shops through the opening of additional shops, we decline to find such a fact on the basis of the record at hand.

(1960). Second, the taxpayer must substantiate, by adequate records or other sufficient evidence corroborating his or her own statement, each of the following elements: (1) The amount of each expenditure; (2) the time and place the expenditure was incurred; (3) the business purpose of the expenditure; and (4) in the case of entertainment expenses, the business relationship to the taxpayer of the person entertained. See sec. 274(d); Meridian Wood Prods. Co. v. United States, 725 F.2d 1183, 188-1191 (9th Cir. 1984); Johnston v. Commissioner, T.C. Memo. 1980-477, affd. 696 F.2d 1003 (9th Cir. 1982). In the case of meals incurred while not traveling, substantiation by sufficient evidence requires that the taxpayer establish the cost, amount, time, place, and date of the expenditure by "direct evidence" (e.g., a detailed writing); the taxpayer may establish business purpose or business relationship by "circumstantial evidence" corroborating the taxpayer's own statement. Sec. 1.274-5T(c)(3)(i), Temporary Income Tax Regs., 49 Fed. Reg. 42704 (Oct. 24, 1984).

    1. <u>1997</u>

Of the Schedule C expenses disallowed for 1997, petitioners challenge only the expenses for travel (to the extent of $5,978) and other ($18,719).

a. <u>Travel</u>

Petitioners argue that they have substantiated $5,978 of expenses claimed as travel expenses for 1997 through the introduction of Exhibit 112-P. We disagree. Exhibit 112-P was received into evidence through the parties' stipulation that the exhibit reflects "documents which Petitioners contend pertain to business meals, travel and lodging incurred in taxable year 1997". Exhibit 112-P has approximately 75 pages, and petitioners have not organized or presented the "documents" included therein (mainly photocopies of receipts) in a manner that persuades us that any of the expenses reflected in this exhibit are properly deductible by petitioners. See <u>Romer v. Commissioner</u>, T.C. Memo. 2001-168. Nor do petitioners in their posttrial opening brief make any concerted attempt to persuade us that they have satisfied the requirements for deductibility; petitioners' entire argument on this point is that "These travel expenses are substantiated in Exhibit 112-P and should be allowed." We sustain respondent's determination that petitioners are not entitled to deduct these claimed expenses.[14]

---

[14] We note that during respondent's audit of the subject years Michelsen prepared a "travel expense record" for 1997 and that this expense record was admitted into evidence as part of Exhibit 135-P. The expense record is an 8-page document that lists in single spaces each day in 1997 (i.e., 01/01/97, 01/02/97, and so on). To the right of some of the days is a brief statement by Michelsen as to the business that she performed for the Nature's Touch shops on the corresponding day,
(continued...)

b.  Other Expenses

Petitioners argue that they have substantiated the $18,719 claimed as "other expenses" through the introduction of Exhibits 119-P and 120-P.  We disagree.  Exhibit 119-P was received into evidence through the parties' stipulation that the exhibit reflects "documents which Petitioners contend pertain to other expense for taxable years 1997".  Exhibit 120-P was received into evidence through the parties' stipulation that the exhibit reflects "documents which Petitioners contend pertain to the bank deposit analysis".  Together, Exhibits 119-P and 120-P have approximately 110 pages, and the "documents" included therein (mainly canceled checks, bank statements, and receipts) do not persuade us that the expenses reflected therein are properly deductible by petitioners.  Nor do petitioners in their posttrial opening brief persuade us that they have satisfied the requirements for deductibility; petitioners' entire argument in brief as to this point is as follows:

> The deduction taken of $18,719 has been adequately substantiated (Exh 119-P and 110-P).  Natures Touch as a sole proprietorship during the first 10 months of 1997 was an accrual taxpayer.  Expenses budgeted to begin the Carlsbad store location were accrued by the sole proprietorship.  This is an issue that Respondents

---

[14](...continued)
as well as her statement of any purported business meal that she purchased on that day along with the identity of the person with whom she dined.  We give little weight to the "expense record". We note that the expenses reflected in many of the invoices in Exhibit 112-P do not appear on Michelsen's expense record.

[sic] counsel may raise.  Petitioners believe they should prevail.

We sustain respondent's determination that petitioners are not entitled to deduct these claimed expenses (except for $3,668 that respondent concedes is deductible).

2. <u>1998</u>

Of the Schedule C expenses (other than home office deduction) disallowed for 1998, petitioners do not challenge any of those expenses.

3. <u>1999</u>

Of the Schedule C expenses (other than home office deduction) disallowed for 1999, petitioners challenge only the expenses for lease ($7,476), travel ($4,129), and meals ($9,789).

a. <u>Lease Expense</u>

Petitioners argue that the $7,476 claimed as a lease expense was actually a legal expense that is deductible as such.  We do not find that any of that amount is deductible.  Petitioners' entire argument in brief as to this point is that "The amount listed on Schedule C for lease expense was misclassified.  The $7,476 amount related to legal fees related to a tax litigation matter and should be fully deductible (TR2-130:1-12; TR 225:17-227:14)".  The reference to "TR2-130:1-12" is to the following testimony by LeBloch on direct examination:

> There is a mistake on the Schedule C attached to the 1997 [sic] return, and the mistake is a misclassification.  There was listed an amount on the

> line that called for lease expense.  The amount was
> $7,476.
>
>      In reviewing workpapers, that amount should have
> been classified as legal expense.  It related to the
> legal cost that Cathy Michelsen had incurred related to
> a Tax Court proceeding dealing with taxable years 1993
> through 1995 and paid to a law firm, the Joseph Mudd
> Law Firm.  Those proceedings related to Tax Court
> Docket 14780-97.

The reference to "TR 225:17-227:14" is to Michelsen's direct

testimony that she had a case in this Court in the "1999 time

frame" and had received a bill from an attorney named Joseph Mudd

for $7,632.75 of legal fees.  We are unpersuaded that petitioners

are entitled to deduct for 1999 the $7,476 claimed for that year

as a lease (or, as they claim now, a legal) expense.

        b.  Travel

     Petitioners argue that they have substantiated the $4,129 of

expenses claimed as a business travel deduction through the

introduction of Exhibit 123-P and the testimony of Michelsen.

That evidence, petitioners conclude, proves that they traveled to

Australia to attend the Sydney gift show, to search for a

location in Australia to open a fourth Nature's Touch store, and

to identify merchandise to import into the United States.  We

disagree that petitioners are entitled to any of their reported

travel expenses for 1999.  Petitioners have simply not persuaded

us that their trip to Australia was related primarily to

Michelsen's reported work for her sole proprietorship during 1999

as a "Corporate Director/Consultant".  Nor have petitioners

persuaded us as to the specifics of their day-to-day activities while in Australia or, more specifically, the amount of time that they purportedly spent on business versus personal pursuits. Exhibit 123-P was received into evidence through the parties' stipulation that the exhibit reflects "documents which Petitioners contend pertain to business related travel for taxable year 1999". Exhibit 123-P has approximately 70 pages, and petitioners have not organized or presented the "documents" included therein (mainly photocopies of receipts) in any manner that persuades us that any of the expenses reflected in this exhibit are properly deductible by petitioners. Nor do petitioners in their posttrial opening brief persuade us that they have satisfied the requirements for deductibility; petitioners' entire argument on this point is:

> The trip had a clear business purpose. Ms. Michelsen was actively pursuing a business expansion. (TR169:16-171:1) Substantiated costs total $12,847 (Exhibit 123-P). Only one-third of this expense was allocated to business. A deduction of $4,129, which was taken on the return, should be allowed.

We sustain respondent's determination that petitioners are not entitled to deduct these claimed expenses.

### c. Meals

Petitioners argue that they have substantiated the $9,789 of expenses claimed as a meals deduction for 1999 through the introduction of Exhibit 124-P. We disagree. Exhibit 124-P was

received into evidence through the parties' stipulation that the exhibit reflects "documents which Petitioners contend pertain to overnight business meal expense for taxable year 1999". Exhibit 112-P has approximately 20 pages, and petitioners have not organized or presented the "documents" included therein (mainly photocopies of receipts) in any manner that persuades us that any of the expenses reflected in this exhibit are properly deductible by petitioners as "meals". See Romer v. Commissioner, T.C. Memo. 2001-168. Nor do petitioners in their posttrial opening brief make any concerted attempt to persuade us that they have satisfied the requirements for such deductibility; petitioners' entire argument on this point is that "Expenses incurred are substantiated in Exhibit 124-P. Total expenses are $9,789." We sustain respondent's determination that petitioners are not entitled to deduct these claimed expenses.

E. Epilogue

We have considered all of the parties' arguments, and all arguments not discussed herein have been rejected as moot, irrelevant, or without merit.

Decision will be entered

under Rule 155.